And the next case is Martin Siegel v. Delta and Airtran. And Mr. Russell is here for Siegel. Mr. Allen and Mr. Atkins are here for Delta and Airtran. And Mr. Allen and Mr. Russell, you may begin when you're ready. May it please the Court, Kevin Russell on behalf of the plaintiffs. I think it is common ground, or at least it should be, that if Airtran had written a letter to Delta in the fall of 2008 saying, if you impose a first bag fee, we will as well, and Delta had written back saying agreed, that would constitute blatant price fixing. There are three principal differences between that scenario and what happened here, but none of them changes the outcome. The first is that defendants dispute our characterization of the substance of Airtran's communications as inviting Delta to impose a first bag fee and promising to follow suit. They say it's not an invitation to collude. Second, rather than writing a letter, Airtran made some of the statements through a public earnings call. And third, rather than writing back and saying agreed, Delta simply imposed the fee. When you discuss ascertainability, you're going to go straight to the summary judgment issue, right? Yes, I'm starting with summary judgment because I don't think we're going to reach class certification unless we get that reversed. But I'm happy to talk about anything the Court wants to. So the third difference is that rather than writing back, Delta simply imposed the fee, which gives rise to the question of whether in imposing the fee they were accepting the invitation, or instead, as they claim now, their leaders were convinced that bag fees don't produce share shift, and so they didn't care what Airtran did. If this Court resolves the case in defendants' favor on either of the first two grounds, on either of the first two distinctions, you will set up a template for lawful price fixing. If you say that what Airtran said here didn't amount to an invitation to collude, Koch can write a letter to Pepsi and say, look, we have the mechanisms in place to raise prices. We haven't done so thus far because our main competitor hasn't done it. We prefer to be a follower rather than a leader. But if you were to raise prices, we would seriously consider doing the same. Let me ask you this. What is your best case that says that public statements made in an earnings call should be construed as an offer? Give me your best case that holds that. I don't have a case that goes one way or the other about earnings calls. We have a case from the Ninth Circuit that says public nature of a statement doesn't matter, and we have the statute, which doesn't leave room for drawing distinctions about how conspiracies are formed. It says all conspiracies in restraint of trade are unlawful. The other problem I have is the statements made by, I think he pronounces his name, Fasano. You've got Farinano and Fasano. They're both pretty close to each other. Fasano testified in his deposition, as I understand it, that all of those previous statements he made were not true. I don't think that's quite right. He testified that one of them, a key one, wasn't true. Well, how much weight are we to give any statements made by Fasano after looking at his deposition testimony? Well, it's going to be up to the jury to decide whether he was lying in his deposition or he was lying in his e-mail. That is a quintessential question for a jury to decide. But even setting aside Fasano, we have the earnings call, and I don't think there's any dispute about what they said in that case. And if you hold that you can say these kinds of things in an earnings call, then Koch isn't going to write the letter to Pepsi. They're just going to say this in an earnings call. And as I said, the statute doesn't provide any basis for a carve-out for earnings calls. And their policy concerns, I think, are based on a misconception of what we think is the critical features of the statements here. The thing that crossed the line here is the fact that they said what they would do in response to price leading. They made a contingent statement about what they would do if a competitor did something. And that is not what happens in earnings calls. Earnings calls are about saying what we're going to do, what we have done. They have not cited a single other earnings call in which somebody has made a contingent statement like this, much less one that is directed specifically at another competitor and conveys to them that you don't have to worry about us following a price leading. And that's important because the principal thing that is protecting consumers from monopoly prices in an oligopoly is the price leader's uncertainty about whether its lead will be followed. And what a statement like this does is remove that uncertainty. And it does it in a way that costs the speaker nothing. Let me ask you this question. The two statements made by these two individuals we've talked about, is that your best evidence in this case that there was a conspiracy to price fix between Delta and AirTran? I think they are probably the best evidence, but I don't think... What other evidence do you have? So the other plus factor that we've identified. Recall, in ordinary price fixing cases, you don't have any evidence about the communications between the defendants. It's usually a black box. And what you have to rely on is objective evidence of what was going on before and after. And so what we have is evidence that AirTran said, we are not willing to impose this fee by ourselves. They've said we're not willing to act independently. They've said that to their investors. And Delta, in its value proposition, right before it made its decision, had calculated that it was exceedingly risky for it to be a price leader. That if AirTran didn't follow suit, they would lose hundreds of millions of dollars. And that at the moment, before the AirTran earning call, they had no better than a 50-50 confidence that AirTran would follow suit. And it's not credible for them to claim that they went ahead and did it anyway. What do you say, though, about Delta's argument? They've got a merger pending before the Department of Justice with Northwest. The Department of Justice approves the merger. But before the merger was approved, Northwest is already charging this baggage fee. So Delta has sort of put in a catch-22. Now their merger partner is making $400 million a year on the baggage fee. And so Delta says, well, we've now merged with them. They've either got to tell Northwest, you can't charge the fee anymore, or we've got to charge it. To me, that's pretty strong evidence. It's pretty strong evidence. That there's no conspiracy here to price fix. That's strong evidence that they had to make a decision. And they had to choose either we're going to go with Delta's no-fee rule or Northwest's rule. And we have direct evidence from their records that their original plan was to impose Delta's no-fee rule on Northwest. This is Plaintiff's Exhibit 149 from Gil West, who was the person assigned to make the proposal to do this. And he told his colleague, Gil Granite, that his plan was, as of September 5th, to propose that the current DL fares, the Delta bag fees, for the new DL, the post-merger airline, and then the fee matrices that were produced that list the bag fees for the post-merger airline, it was listed as free until after the AirTran earnings call. In addition, we have Plaintiff's Exhibit 215, another email from Gil West, who defendants themselves identify as the principal proponent of the bag fee, as the person who does not believe in share shift. And he says in that email, this is the day of AirTran's earnings call, Gail has analyzed the book away sensitivity. This is the revenue management. She forwarded me a rough draft of the analysis. This is the value proposition. It sounds like it's about a wash in terms of net revenue, which means we would not implement first bag fee. He doesn't say that the value proposition is premised on share shift, and I don't believe in share shift. And he's not even open to the possibility that somebody else in the organization is going to think that share shift is not a thing, and as a consequence, they don't face any real catastrophic risk of imposing this fee, unless they're sure that AirTran will follow. This directly contradicts their claims that they didn't care about AirTran, but there's other evidence as well. What's his position with the company, Gil West? Gil West was in the ACS, the Air Customer Services. He was the one who was assigned with developing the joint fees for the post-merger airline, and his boss was Steve Gorman, who was the COO. Was his deposition taken? Yes. His deposition is in the record? It is. Okay. We also have the email at Plaintiff's Exhibit 148, when he forwards to his boss, COO Gorman, a news article about Continental imposing the first bag fee, making Delta the last major legacy carrier without one. And what he says is, quote, I assume we still want to hold until AirTran moves. That is, shows that there is an understanding as of September 5th that contrary to their claims that they don't care about what AirTran does, AirTran is small potatoes, we don't believe in share shift, there has been a decision to hold until AirTran moves. And Gorman, his boss, COO, doesn't respond by saying, what are you talking about, AirTran is small potatoes, we don't believe in share shift, we don't care what AirTran does. He says, I have not talked to RA yet, which is Richard Anderson, the CEO. There is ample evidence from which a jury could infer that, in fact, their sole reason that they give for disbelieving the conclusions of the value proposition, that is, that they don't believe in share shift, just isn't true. It's made up. It's a post hoc explanation of their conduct. Okay. Now, in your briefs, you also, in addition to the e-mails, you make reference to what you call back channel communications between Delta and AirTran employees. That's right. What kind of, where is that in the record now? So there are e-mails in the record as well reflecting those communications. It's at plaintiff's exhibit 112 is one of the initial ones, 106, 126, and 128 are the main e-mails between Mr. Fasano and his superiors at AirTran where he is communicating to them. Probably the most important one is 126 where he says he met with somebody very connected on the high level operational and planning side of the house and who told him that Delta was waiting on AirTran to make a move. And, of course, that's consistent with AirTran then making the statements that it did. In the earnings call, it was responding to that invitation. And so the fees were adopted in what time proximity to one another? Well, they were announced within a week of each other, and they were effective the same date. Okay. All right. Thank you. Thank you, Counsel. And we'll hear from Mr. Allen. May it please the Court, Randall Allen on behalf of Delta Airlines. Let me start. I just want to address this last exchange, the issue of Mr. Gil West's participation in creation of a fee matrix for the combined airline following the merger. Counsel focused on the fact that at the beginning, shockingly, at the beginning of Delta's consideration, Delta employee Gil West concluded that Delta's position would populate the fee matrix. That's on September the 5th. On September the 26th, the record reflects that Mr. Gil West's department, and I think Counsel correctly identified that his superior was Steve Gorman, who was the COO, Chief Operating Officer of Delta Airlines, and the lead of the Airport Customer Services, or the ACS, department. That group proposed a budget to the leadership of Delta, and that budget included charging for a first bag fee. So this is a month before Mr. Fennaro's statement on his earnings call. The leadership of ACS was proposing that Delta adopt the bag fee and that that would solve some of the budget shortfall issues that Delta was confronting in the fall of 2008. Also, at approximately that same time, when ACS presented that budget showing that Delta would make something in the range of $250 million a year as a result of adopting the bag fee, Delta's CEO, Richard Anderson, and its president, Ed Bastian, engaged in an e-mail exchange in which Mr. Anderson reported, we need to think about implementing the fee post-merger. A lot of revenue involved. And Mr. Bastian responded, think we probably should, but as part of integrating the two companies. Glenn, that's Glenn Hauenstein, who is the head of the Revenue Management Service that prepared this study that Mr. Russell referred to. Well, this sounds like a good closing argument to the jury, but why can't the jury assess the credibility of Mr. West and Mr. Fasano when they testify at trial? Well, the question, Your Honor, is whether or not the evidence indicates or is probative to the fact that it is more likely than not that Delta did not act independently. And so the question is, looking at the decision that they made, is it, to use the language of Tuscaloosa v. Harcross Chemicals, is it inexplicable that Delta took this action? And the evidence, what we've seen from the evidence, is that at the time that Delta made its decision... When I look at the earnings call, Air Trans CEO all but tells Delta they would implement the fee if Delta did it first. That seems like that alone is enough, even absent the back-channel communications and the e-mails. That unilateral public statement is insufficient, Your Honor. What Williamson Oil tells us is that a public statement made by a competitor is insufficient unto itself to create an inference of a price-fixing agreement. If you look at the facts of Williamson Oil, I know you're very familiar with Williamson Oil. In that case, there were 12 parallel price increases. There were numerous public statements in analyst reports and in published pricing and in press statements. There were many forward-looking pricing statements. And as Williamson Oil pointed out, and I think Twombly, Harcross, and other cases make this point, that competitors are entitled to consider, to hear and consider those public statements. My only point to you is that in this instance, there's insufficient evidence that they did consider them or that they did factor into Delta's decision-making process. But if they had, Williamson Oil tells us that to consider those statements is permissible. Well, Siegel says that there are some internal documents in this record that would demonstrate Delta's internal documents that demonstrate it would lose millions of business to AirTran if AirTran implemented the fee and it did not. Do we have those documents in the record? I believe that the document that they're referring to is the value proposition slides, and I take great exception at the characterization of that, but I think it's important. The document does not establish that it would be adverse to Delta's economic interest to implement the first bag fee in the fall of 2008. It just unequivocally does not establish that. But you have to look at that document in what I think is an undisputed context. That is a document that was prepared by the revenue management group to advocate against adopting the bag fee. It was an advocacy piece presented to management to convince management not to adopt the bag fee. So that to argue that that is the document that convinced them to adopt the bag fee, first of all, is folly at best. But I think I heard one of the questions. Both Delta can make that argument to the jury. Well, Your Honor, I believe in order to get to the jury, the plaintiffs have to adduce some evidence that is probative to the point that Delta would not have independently adopted the bag fee. And plaintiffs have not crossed that hurdle, and that document doesn't push them across that hurdle is my point. All right. Thank you. Mr. Allen, we'll hear from Mr. Atkins. Good morning, Your Honors. Alden Atkins for Airtran. I'd like to make two points this morning. The first is that Mr. Fornaro's public comments during an earnings call do not tend to exclude the possibility that Airtran and Delta acted independently and therefore are not a plus factor. Monsanto said, Matsushita said, and this Court said in Williamson Oil, that the test for whether they have enough evidence to go to a jury is it must tend to exclude the possibility of independent conduct. My second point is that Mr. Fasano's efforts to communicate with Delta several months before... burden tougher on your client, seems to me. If that's the standard that you have to produce, if they have to produce evidence that tends to exclude the possibility, that's a lighter burden on their part. No, it's not a lighter burden at all. It must tend to exclude the possibility that the parties were acting independently. And so after nine years of litigation, the facts are pretty straightforward at this point, which is that in the summer and fall of 2008, the other major airlines, most of the other major airlines, had adopted first bag fees. It was a subject of great interest to the investment community. They had adopted them. Analysts, investors had asked them over and over again, the competitors, whether they were adopting first bag fees and after they adopted them... But what's different here is that Delta and AirTran are competitors in this market in the Atlanta airport. Right? Correct. But you look at it from... The question is, does it tend to exclude the possibility? So on the one hand, you have AirTran, and you have Mr. Fornaro. Sorry, the names do get a little tough to keep straight. Mr. Fornaro, who is answering an explicit question from an analyst. The analyst was the one who asked him the question, if your competitor would do it, would you do it? And he gave a noncommittal response. He said he would strongly consider it. He didn't say that they would do it. And strongly consider is not a commitment. We've cited cases to you on that score. But here's the other thing. Yeah, wink and a nod. You know, that's the evidence that you rely on, that kind of evidence, in order to prove Sherman 1 conspiracy. You're not going to have direct evidence. That's the kind of evidence that you rely on in order to establish a Section 1 conspiracy. Unity of action. A wink and a nod here. Unity of purpose or common design or understanding. A meeting of the minds. That's classic antitrust evidence. In antitrust cases, the courts, starting with the Supreme Court, have said that competitors can consider what other competitors are saying and doing. For example, in Bell Atlantic v. Twombly, this is at pages 553 and 54, the court said, it is well established that two competitors may lawfully observe each other's public statements and decisions without running afoul of the antitrust laws. In text messaging, Judge Posner said that competitors watch each other like hogs. And he referred to exactly this type of situation, the adoption of bag fees. In Clampall, this is Justice Breyer, when he was sitting on the First Circuit, how does one order a firm to set its prices without regard to the likely reaction of competitors? And, of course, in Baby Foods and Valspar, the Third Circuit said it would be impossible for an actor not to consider what others are saying and doing. And so the question is, on the Airtran side, was it acting independently? Does his statement tend to exclude the possibility that Airtran was acting independently? And the answer is no. And we know that because this Court said so in Williamson Oil, not just with a single statement, but with a whole series of statements which described things like we will not be a price leader, which said things like one of the competitors would forego further price increases. Another competitor said we shall be ready to respond tactically when necessary. And the Court held, this Court held, as a matter of law, that those were not sufficient. So back to the question that the Court has to answer, which is, does Mr. Fornaro's statement tend to exclude the possibility of independent conduct? And on the Delta side, what we have is that Delta was making its decision. It had planned all along to make its decision at the time of the murder. It hadn't decided whether it would be a yes or no, but that it was going to make that decision. And it stuck to its knitting, and it did that. And along the way, there is evidence that one of the factors considered in the value proposition is the possibility that Airtran would follow suit. And the Supreme Court has said, and this Court has said, and the other courts of appeals have all said that it was lawful for Delta to take that into consideration. And the fact that Mr. Fornaro said it does not tend to exclude the possibility of independent conduct by either of them. And, of course, the Sherman Act, Section 1, it's a conspiracy. It takes two to tango. So regardless of what Airtran may have been doing, it required both of them, and it required acceptance on the side of Delta. And so what we know is that the two companies were making their own independent decisions. And the fact that Delta may have considered what it said is something that this Court and the courts of appeals have said is lawful. Mr. Fornaro's statement bears no resemblance to the small number of cases under Section 5 of the FTC Act which have held that a unilateral invitation to collude a public statement is sufficient. Judge Dubina, to answer your question, there are no cases that have held that this evidence is sufficient to find an antitrust violation. The plaintiffs are asking you to break new ground. The Supreme Court said in Monsanto, and I think that this is illustrative and important, in Monsanto you have a dealer termination case. So you have competing dealers talking to the manufacturer and telling the manufacturer that they would like for another dealer to be terminated. And what Monsanto said when it adopted the tend-to-exclude language is that even if Monsanto received those communications from the dealers, it could still lack. There was more evidence required, and that evidence was not here. Thank you. All right. Thank you, Mr. Atkins. Mr. Russell, you've reserved some time for rebuttal. Thank you. I'd like to start with the earnings call. I think there are two questions for you with respect to it. And the first is, is the substance of what was said there reasonably construed by a jury to be an invitation to collude? I think that it is. If you say that it isn't, you're going to have these similar statements being made all the time among competitors. The second question is whether, assuming it constitutes an invitation to collude, there's something special about the context of an earnings call that makes it nonetheless permissible. And we know that that's not true, among other reasons, because at least Delta acknowledges, although Airtrain denies it, that Section 5 of the Federal Trade Communications Act independently prohibits making these kinds of statements, including an earnings call. Congress made the determination that you can't make these kinds of statements because they remove the kind of uncertainty which is the only break against collusive pricing in oligopolies. And we also know that these kinds of statements aren't commonly made because of Delta's reaction to them. Delta was surprised. Some of their officials even thought, were willing to say they were inappropriate. Their own antitrust manual says, don't make statements like these. Don't make statements about future pricing decisions. And again, they haven't cited to a single example of another earnings call, where somebody made a statement that was both contingent, a statement about what they would do in response to price leading and directed at a particular competitor. Second, the other major question, I think, is whether Delta imposed the fee independently or because it did so only because it had been assured that Airtrain would follow suit. And the principal question there, I think, is whether the value proposition position was accepted by the decision makers at Delta. And there's ample reason to believe that it was. It was specifically commissioned for this purpose. And the principal reason that Delta gives for its officials disbelieving in it is that they disbelieve that bag fees cause share shift. And that's not credible. Delta conducted three internal studies on that question, a brand tracking study, a baggage handling study, and the value proposition itself. All of them found that bag fees do produce share shift. It is a premise of their class action appeal that basic economics tells us that consumers are responsive to the total price of air travel. And there are the internal e-mails that I've already cited to you that make clear that they did care about what Airtrain was doing, and they did care about competitive effects. And so I don't think the one other thing I would point to as kind of circumstantial evidence that a reasonable jury could adopt the conclusion that they cared about share shift is that the Department of Justice, when confronted with these same arguments, said, look, we're not convinced and looked at the same e-mails that they've presented in their e-mails and said, we're not convinced that they show either that the decision was made before the Airtrain call or that they show that Delta didn't care what Airtrain did. With respect to... There have been some arguments about Williamson Oil establishing some kind of principle that defendants are entitled to take into account public statements by competitors. That's true as a general matter, but Williamson Oil certainly didn't say, you're entitled to act on public invitations to collude. Because if you did that, you would just open the door to collusive statements being made and acted on all the time with all the same harms associated with a backdoor agreement to do this. A couple points about the record. There was a reference to the baggage... to ACS presenting a baggage... a budget, which included the first bag fee. We discussed this in our briefs. It wasn't a budget. It was a proposal of a series of potential actions that could be taken. If you look at the list of them, many of them are potentials, but certainly they weren't being taken seriously. They suggest deferring engine maintenance until 2009, for example, and I don't think there's much prospect that they were going to do that. And in effect, we know from the subsequent e-mail from Gil West the day of the Airtrain call that to the extent there was any belief prior to that that this was a good idea, once he saw the draft value proposition and showed that the share shift was so significant as to erase the entire potential new revenue plus a lot more, that he was convinced that this wasn't something that was worth doing. And again, it's notable that their principal evidence that this wasn't their position is not contemporaneous documents from the time. It is their post-hoc deposition testimony, which requires an assessment of their credibility, and that's the quintessential kind of thing that we expect juries to do. I'm happy to answer any questions the Court might have about the class certification or anything else that otherwise will rest. Thank you. Mr. Russell? Thank you, Your Honor. Just a couple of quick points. First of all, the idea that there's been some rule advocated here that's going to create, I think, the phrase that was used as a template for price fixing in the public arena is simply inappropriate. If, in fact, a statement is made in the public arena that is properly characterized as an invitation to collude, that statement would be actionable under Section 5 of the FTC Act. That, of course, is an action that would be a unilateral action against the speaker of the statement. So the suggestion that we're creating some sort of safe haven for that kind of conduct to the extent it occurs is not appropriate. You know, I'm not sure you get the last word here if we're not talking about ascertainability. You're the cross appellate? That is correct. I'm happy to talk about any of the class issues if you'd like me to address ascertainability. You know, I think if we're not going to talk about ascertainability it's probably not fair. Let me touch on it quickly, and then I will sit down, Your Honor. Okay. Now, they're going to have an opportunity to come back up and talk about ascertainability after you finish now. That's fine, Your Honor. Okay. The reason that we are here on an ascertainability issue is the same reason that the Court confronted an ascertainability issue in Carhu. And the reasons that it's appropriate here are the same as the reasons in Carhu and in Busey. The reason is that the plaintiffs did not do any work or any workup or any discovery to determine whether or not the class that they were advocating was, in fact, ascertainable or otherwise identifiable through administratively feasible means. The problem I have with ascertainability is what's the origin of this ascertainability requirement? There's nothing in Rule 23 about ascertainability. The origin, Your Honor, is Rule 23 itself. The Court has determined that the class has to be identified, and Carhu and Busey define or expound on that requirement that it has to be identified through some administratively feasible means. The problem I have with it, if we have to reach it, is you've got four circuits that cut against you on your argument there. Well, I'm in the Eleventh Circuit that doesn't cut against me. Well, the Eleventh Circuit has two unpublished opinions which are not binding on this Court. They absolutely are unpublished, and they absolutely are not binding. They are, in fact, opinions that have been followed throughout the districts in this circuit and followed successfully. Thank you, Your Honor. All right. Thank you, counsel. And, Mr. Atkins, are you going to make an argument on ascertainability? No, Your Honor. All right. We'll hear from Mr. Russell. Your Honor, I'm happy to discuss ascertainability, but I don't know that I need to. I would just say that, you know, the reasons for not recognizing an administrative feasibility requirement are laid out in our brief. They're laid out in four-circuit decisions, which we think are convincing. We've also explained in our brief why even if there was such a requirement, it's met here because there is much greater information from which we can confirm the allegations in an affidavit from somebody who says that they paid the first bag fee than there were in Care Who, for example. And this is very similar to the amount of data that this Court thought was sufficient in Bucy. All right. Thank you. Thank you, counsel. The next case is Common Cause v. Brian Kemp. Mr. Thorpe is here for Common Cause. Mr. Hite for Kemp, and Mr. Thorpe, you may begin when you're ready.